[relates to Docket Item 16]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
————————————————————— :
                                :
KAISER FOUNDATION HEALTH PLAN,  :     HON. JEROME B. SIMANDLE
INC. et al,                     :
                                :     Civil No. 08-4376 (JBS)
            Plaintiffs,         :
                                :
    v.                          :            OPINION
                                :
MEDQUIST, INC. & MEDQUIST       :
TRANSCRIPTIONS, LTD.,           :
                                :
            Defendants.         :
                                :
————————————————————— :
```

APPEARANCES:

David Perez, Esq.
GREENBERG TRAURIG LLP
2101 L Street N.W.
Suite 1000
Washington, DC 20036
       -and-
Ian Seth Shainbrown, Esq.
GREENBERG TRAURIG LLP
200 Park Avenue
Florham Park, NJ 07932
       Attorneys for Plaintiffs


Marc J. Gross, Esq.
GREENBAUM, ROWE, SMITH & DAVIS, LLP
75 Livingston Avenue
Suite 301
Roseland, NJ 07068-3701
       -and-
Olivier Salvagno, Esq.
GREENBAUM, ROWE, SMITH & DAVIS, LLP
P.O. Box 5600
Woodbridge, NJ 07095
       -and-
Stephen Smerek, Esq.
WINSTON & STRAWN, LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
       Attorneys for Defendants

**SIMANDLE,** District Judge:

## I.   INTRODUCTION

This matter is before the Court upon Defendants' motion to dismiss Plaintiffs' Complaint [Docket Item 16].  Plaintiffs, a collection of hospitals and health care providers, allege that Defendants, providers of medical transcription services, fraudulently overbilled Plaintiffs for the transcription services they provided and breached their contractual agreements with Plaintiffs.  As the ensuing discussion makes clear, the allegations in the Complaint are in many respects similar to those addressed in the Court's prior Opinion in <u>South Broward Hosp. Dist. v. MedQuist Inc.</u>, 516 F. Supp. 2d 370 (D.N.J. 2007). For the reasons set forth below, the Court will grant Defendants' motion to dismiss Plaintiffs' claim brought pursuant to the California Unfair Competition Law's fraudulent business practices prong, but will deny the remainder of the relief Defendants seek.

## II.  BACKGROUND

### A.   Facts

The facts of this dispute, as they appear from Plaintiffs' Complaint, are as follows.  Plaintiffs (collectively "Kaiser") are six hospitals and health care providers located in California, Maryland, and Colorado.[1]  (Compl. ¶¶ 1-7.)

---

[1]  The Plaintiffs are Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; the Permanente Medical Group, Inc.;

Defendants MedQuist, Inc. and MedQuist Transcriptions, Ltd. (collectively "MedQuist") are New Jersey-based business organizations. (Id. at ¶¶ 8-9.) MedQuist is, according to the Complaint, "the largest medical transcription company . . . in the United States." (Id. at ¶ 11.)

In or before 1998, MedQuist entered into contractual agreements with each of the Kaiser Plaintiffs for the provision of medical transcription services, and such agreements remain in effect to this date. (Id. at ¶ 12.) The Complaint describes the multi-step MedQuist transcription process as follows:

> Doctors at . . . health care facilities dictate their reports free[-]form into a voice recorder that connects with MedQuist via telephone connections. That dictation is forwarded to a transcriptionist retained by MedQuist. The transcriptionist calls up a template for the particular type of report being prepared . . . and types the formal report. The report is then "uploaded" directly into the MedQuist computer system . . . .

(Id. at ¶ 13.)

The dispute in this case centers on the billing practices used by MedQuist for its transcription services. Under MedQuist's contracts with each of the Kaiser Plaintiffs, the Plaintiffs were to be charged on a per-line basis, with the term "line" defined in the majority of the Kaiser-MedQuist agreements

Southern California Permanente Medical Group; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; and Kaiser Foundation Health Plan of Colorado. (Compl. ¶¶ 1-6.)

as an "AAMT line."[2]   (Id. at ¶¶ 15-16.)   The parties' contracts

defined an "AAMT line" as "any line having 65 'characters'," with

a "character" defined as "any letter, number, symbol or function

key necessary for the final appearance and content of a

document[,] including, without limitation, the space bar,

carriage return, underscore, bold and any characters contained

within the macro, header, or footer."   (Id. at ¶ 17.)   Under the

terms of the contracts, "[a] defined line is calculated by

counting all characters contained within a document and simply

dividing the total number of characters by 65 to arrive at the

number of defined lines."   (Id. at ¶ 17.)

As in South Broward, the Kaiser Plaintiffs allege that

MedQuist did not calculate the number of billed lines in

accordance with the previously quoted contractual provision.

Instead, Plaintiffs allege that MedQuist "used ratios and

formulas to determine the number of 'AAMT' transcription lines

for which clients were billed rather than counting the number of

relevant characters to determine a billable line as provided for

in the contracts," and failed to disclose the use of such ratios

and formulas to Plaintiffs.   (Id. at ¶ 18.)   In particular,

according to Plaintiffs:

> MedQuist carried out its fraud against Kaiser by, inter
> alia, either simply turning off the counting [mechanism]

---

[2]   "AAMT," the Complaint states, stands for the American
Association of Medical Transcriptionists.   (Compl. ¶ 16.)

> and [instead] multiplying a payroll line count by a
> multiplier to obtain a fraudulent line count to insert on
> invoices, or by inserting hard returns or bogus
> characters into reports to obtain a fraudulently inflated
> line count to insert on invoices. MedQuist then
> explicitly or implicitly communicated, falsely, to its
> clients including Kaiser that MedQuist had properly
> counted the lines in accordance with the contractual
> provisions.

(Id. at ¶ 27.)

Plaintiffs allege that MedQuist employed such means of calculating billed lines "in order to increase the amount actually billed to a client in order to increase profit margins," (id. at ¶ 19); that is, Plaintiffs allege that MedQuist intentionally used "bogus" and "artificially inflat[ed]" line counts in order to bill Plaintiffs at a rate higher than the parties' contractual agreement provided, with the aim of "increas[ing] MedQuist's profits."[3]  (Id. at ¶¶ 20-21.) Plaintiffs further allege that MedQuist has admitted to having employed ratios, rather than character counts, in order to produce such inflated line counts for billing purposes, although Plaintiffs do not specify the context of MedQuist's alleged admission in the Complaint.  (Id. at ¶¶ 18-19.)

According to the Complaint, MedQuist also "employed a system

---

[3]  Additionally, Plaintiffs allege that "[t]he specific internal corporate mechanisms and operations by which MedQuist carried out the fraud . . . and the specific activities engaged in by specific personnel in furtherance of the fraud, are within the exclusive knowledge and understanding of those within MedQuist."  (Compl. ¶ 25.)

to prevent Kaiser from discovering the inflated billing practices
utilized." (Id. at ¶ 22.) Specifically, Plaintiffs allege that
MedQuist "refused to release information to Kaiser about the
manner in which its invoices were calculated," but would instead
invoice Kaiser "twice a month without any breakdown for the costs
charged." (Id.) MedQuist's aim in employing such deliberately
nonspecific invoices, Plaintiffs allege, was to render Plaintiffs
"unable to discern the inflated nature of MedQuist's bills
because the manner of invoicing did not delineate the specific
work performed but contained only gross amounts." (Id. at ¶ 21.)
According to Plaintiffs' allegations, "[t]he only way for a
hospital to find out if it had been overcharged was for it to
count the total number of lines in all the reports prepared by
MedQuist for the corresponding time frame on the invoice and
compare that to the total invoice price." (Id. at ¶ 22.)
Plaintiffs' facilities were incapable of performing such an
assessment of the contents of all participating physicians'
reports during a particular billing period. (Id.)

**B.   Procedural History**

Plaintiffs commenced this lawsuit in California Superior
Court on June 6, 2008. (Docket Item 1 Ex. A at 1.) In their
Complaint, Plaintiffs assert claims for common law fraud (Count
I), breach of contract (Count III), and unjust enrichment (Count
V), as well as a claim that Defendants violated California's

Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq. (Count II), and a demand for an accounting (Count IV). Defendants removed the action to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1441(a) [Docket Item 1].  Upon the parties' Joint Stipulation, wherein the parties "agree[d] that this action is related to [South Broward]," the Honorable Phyllis J. Hamilton, United States District Judge for the Northern District of California, entered an Order transferring the case to this Court.  (Docket Item 27 at 2-3.)  By stipulation [Docket Item 28], the parties agreed to stay the briefing on Defendants' motion to dismiss [Docket Item 16] until the matter was transferred to this Court. The Court heard oral argument on Defendants' motion on March 19, 2009 and reserved decision.

III. DISCUSSION

    A.    Standard of Review

    This Court has jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332.  On a Rule 12(b)(6) motion to dismiss for failure to state a claim for which relief may be granted, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)

(quoting <u>Pinker v. Roche Holdings Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

> While Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because "it strikes a savvy judge that actual proof of those facts is improbable," the "[f]actual allegations must be enough to raise a right to relief above the speculative level."

<u>Phillips</u>, 515 F.3d at 234.  "To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'"  <u>Victaulic Co. v. Tieman</u>, 499 F.3d 227, 234 (3d Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  <u>Twombly</u>, 127 S. Ct. at 1964-65 (quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)).

> "[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest" the required element. [<u>Twombly</u>, 127 S. Ct. at 1965 n.3.]  This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element.  <u>Id.</u>

<u>Phillips</u>, 515 F.3d at 234.  "In deciding motions to dismiss

8

pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." <u>Lum v. Bank of America</u>, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citation omitted).

### B.   Overview of Choice-of-Law Principles

Before addressing the merits of the parties' arguments, a review at the outset of the choice-of-law principles applicable to this matter is in order.  Ordinarily, "in an action based on diversity of citizenship jurisdiction, [the District Court] must apply the substantive law of the state in which [it sits], including its choice of law rules." <u>Berg Chilling Systems, Inc. v. Hull Corp.</u>, 435 F.3d 455, 462 (3d Cir. 2006).  When a diversity action is transferred pursuant to 28 U.S.C. § 1404(a), however, "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue."[4]  <u>Van Dusen v. Barrack</u>, 376 U.S. 612,

---

[4]  This does not require the Court to apply Ninth Circuit precedent to any federal law issues in the case, including the Court's interpretation of the pleading standards under Rule 9(b), Fed. R. Civ. P.  "[T]he transferee court is usually 'free to decide [federal issues] in the manner it views as correct without deferring to the interpretation of the transferor circuit.'" <u>McMasters v. United States</u>, 260 F.3d 814, 819 (7th Cir. 2001) (quoting <u>In re Korean Air Lines Disaster</u>, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (Ruth B. Ginsburg, J.)); <u>see</u> <u>also</u> <u>Murphy v. F.D.I.C.</u>, 208 F.3d 959, 966 (11th Cir. 2000); <u>Newton v. Thomason</u>, 22 F.3d 1455, 1460 (9th Cir. 1994).  "Only where the law of the United States is specifically intended to be geographically non-uniform should the transferee court apply the circuit

639 (1964) (noting as well that a "change of venue under §
1404(a) generally should be, with respect to state law, but a
change of courtrooms").  The Court must therefore apply
California's choice-of-law rules to this matter.

Under California's choice-of-law rules for contract law,
"[a]bsent an express choice of applicable law by the parties,
'[a] contract is to be interpreted according to the law and usage
of the place where it is to be performed; or, if it does not
indicate a place of performance, according to the law and usage
of the place where it is made.'"  Welles v. Turner Entertainment
Co., 503 F.3d 728, 738 (9th Cir. 2007) (quoting Cal. Civ. Code §
1646).  In tort cases, California courts employ a governmental
interest approach to choice-of-law questions:

> The court first determines whether the interest or policy
> underlying the law will be significantly furthered by its
> application to the case at hand.  If both California and
> the foreign state have a strong interest in applying
> their own law, a true conflict exists.  The court then
> engages in a comparative impairment analysis, and applies
> the law of the state whose interest would be the more
> impaired if its law were not applied.

Am. Bank of Commerce v. Corondoni, 169 Cal. App. 3d 368, 372
(Cal. Ct. App. 1985) (internal quotations and citations omitted);
see also Orr v. Bank of America, NT & SA, 285 F.3d 764, 772 n.4
(9th Cir. 2002).

---

precedent of the transferor court."  Id.

C.    **Waiver**

In its motion to dismiss, MedQuist first argues that Plaintiffs have waived any right to bring claims related to their contractual agreements with MedQuist.  MedQuist draws the Court's attention to the provision governing dispute resolution in each of the Kaiser-MedQuist contracts, which provides:

> In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice.  In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future . . . .

(Compl. Ex. A at 5.)[5]  According to MedQuist, because the Complaint fails to allege that any of the Kaiser Plaintiffs brought their dispute over its billing practices to MedQuist's attention within thirty days of the receipt of a disputed invoice, Plaintiffs have waived their right to assert the claims at issue in this lawsuit.

The Court is not persuaded that this argument requires that Plaintiffs' contract-based claim be dismissed at this time. Plaintiffs' allegations in this matter do not center around a simple dispute over an "invoiced amount."  (Id.)  Rather, Plaintiffs have alleged that MedQuist actively sought to "prevent Kaiser from discovering the inflated billing practices utilized."

---

[5]  See also (Compl. Ex. B at 5; Ex. E at 4; Ex. F at 4; Ex. H at 4; Ex. I at 5; Ex. J at 4; Ex. K at 4-5; Ex. S at 3; Ex. U at 4; Ex. V at 4; Ex. X at 5.)

(Compl. ¶ 22.)  Under the "generally recognized"[6] doctrine of prevention, where a contracting party prevents or hinders its contractual partner from performing under the terms of the contract, the resultant failure to perform in accordance with such contractual terms may be waived or excused.  Pecarovich v. Allstate Ins. Co., 309 F.3d 652, 657 n.8 (9th Cir. 2002) (citation omitted); see also COAC, Inc. v. Kennedy Engineers, 67 Cal. App. 3d 916, 920 (Cal. Ct. App. 1977) (contractor owes contracting partner a "legal duty not to hinder, delay, interfere with or prevent his performance").  The theory underlying the doctrine is self-evident – namely, that a contractual provision that turns on one party's fulfilment of a condition "warrants implication of a promise [from the other party] to refrain from activity impeding its happening . . ." District-Realty Title Ins. Corp. v. Ensmann, 767 F.2d 1018, 1023 (citation omitted) (D.C. Cir. 1985) (citation omitted).

In this matter, Plaintiffs' allegations, which the Court must "accept . . . as true" at this stage of the proceedings,

---

[6]  The Court need not untangle the question, for choice-of-law purposes, of where the contracts at issue herein were "to be performed," Welles, 503 F.3d at 738 (citation omitted), because the doctrine of prevention applies in the all of the potentially applicable jurisdictions.  See New Design Constr. Co., Inc. v. Hamon Contractors, Inc., --- P. 3d ----, 2008 WL 2522306, at *12 (Colo. Ct. App. June 26, 2008); Minogue v. Modell, 384 F. Supp. 2d 821, 826 (D. Md. 2005); Creek Ranch, Inc. v. New Jersey Turnpike Authority, 75 N.J. 421, 432 (1978); COAC, Inc. v. Kennedy Engineers, 67 Cal. App. 3d 916, 920 (Cal. Ct. App. 1977).

Phillips, 515 F.3d at 231 (citation omitted), indicate that they
were hindered in their capacity to comply with the contracts'
provisions requiring notice of a dispute within thirty days of
"receipt by Client of the invoice," (Compl. Ex. A at 5), because
Defendants actively concealed the nature of the inflated billings
by, inter alia, "refus[ing] to release information to Kaiser
about the manner in which its invoices were calculated."  (Compl.
¶ 22.)  In light of Plaintiffs' allegation that Defendants
purposefully frustrated their ability to act within the thirty-
day period, or the one-year period, dismissal on the basis of the
contracts' waiver provisions is not called for.[7]  See, e.g.,
Pecarovich, 309 F.3d at 657 n.8.

   D.   **Particularity of Fraud Allegations**

     The Court next addresses Defendants' argument that
Plaintiffs' Complaint should be dismissed because it fails to
"state with particularity the circumstances constituting fraud,"
as Rule 9(b), Fed. R. Civ. P., requires.  Defendants' arguments
on this point mirror the argument they advanced in support of
their motion to dismiss in South Broward, an argument which the
Court found unpersuasive.  For the following reasons, the Court
again finds Defendants' Rule 9(b) arguments unconvincing, and

---

   [7]  Should Plaintiffs fail to adduce evidence to support
their allegation that MedQuist purposefully inhibited their
ability to detect the alleged overbillings, MedQuist may, of
course, revisit its waiver argument upon summary judgment.

will deny this aspect of their motion to dismiss.

In South Broward, this Court explained the requirement that allegations of fraud be pleaded with particularity, and recognized, contrary to MedQuist's arguments in this matter, that "[a] plaintiff is not required to 'plead the date, place or time of the fraud, so long as plaintiff uses an alternative means of injecting precision and some measure of substantiation into their allegations.'" South Broward, 516 F. Supp. 2d at 384 (quoting Rolo v. City Inv. Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998)) (some internal quotations omitted).

> To meet this standard, the subject and nature of each misrepresentation must be adequately pled. See [Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786, 791 (3d Cir. 1984)]. A court must apply the heightened pleading standards of Rule 9(b) in accordance with the rule's underlying purpose – namely (a) to put the defendant on notice of the precise misconduct surrounding the allegation of fraud asserted against it and (b) to guard against "spurious charges of immoral or fraudulent behavior." See id. at 791; see also Lum, 361 F.3d at 224; New Jersey Sports Prod., Inc. v. Don King Prod., Inc., 1997 U.S. Dist. LEXIS 23209 at *42 (D.N.J. October 28, 1997) (holding that "[t]he central inquiry . . . is whether the complaint is sufficiently precise to place the defendant on notice . . . . ") (emphasis added).

> The Third Circuit has relaxed the heightened standards for pleadings under Rule 9(b) in the case of corporate fraud. See In re Craftmatic Sec. Litig., 890 F.2d 628, 645 (3d Cir. 1989); Shapiro v. UJB Financial Corp., 964 F.2d 272, 284 (3d Cir. 1992). While the rule established in Craftmatic was forged with respect to a securities fraud case, the same purpose – to prevent sophisticated defrauders from successfully concealing the details of their fraud – is equally applicable in instances of corporate fraud. Id. To this end, the Craftmatic court held that "courts have relaxed the rule when factual information is peculiarly within the defendant's

14

> knowledge or control." Id. The pleader, however, must
> (1) allege that the necessary information lies within the
> defendant's control and (2) the allegations must be
> accompanied by a statement of the facts upon which the
> allegations are based. Id. Finally, courts in this
> District have held that "when the transactions are
> numerous and take place over an extended period of time,
> less specificity in pleading fraud is required."
> Kronfeld v. First Jersey Nat'l Bank, 638 F. Supp. 1454,
> 1465 (D.N.J. 1986).

Id. at 384-85 (footnote and some internal citations omitted); see
also In re Burlington Coat Factory Securities Litigation, 114
F.3d 1410, 1422 (3d Cir. 1997); HT of Highlands Ranch, Inc. v.
Hollywood Tanning Systems, Inc., 590 F. Supp. 2d 677, 686 (D.N.J.
2008).

As in South Broward, "Plaintiffs' pleadings are satisfactory
as they function to put MedQuist on notice of the specific fraud
claims asserted against it." South Broward, 516 F. Supp. 2d at
385. Contrary to Defendants' suggestion that Plaintiffs'
allegations of overbilling are conclusory, the Complaint contains
specific factual allegations as to the nature of MedQuist's
alleged overbilling. According to Plaintiffs, despite MedQuist's
contractual promise to derive its invoiced figures by "simply
dividing the total number of characters [in a transcribed
document] by 65 to arrive at the number of defined lines,"
(Compl. ¶ 17), MedQuist "turned off" the counting mechanism in
its computer programs, and instead multiplied its
transcriptionists' "payroll line count by a multiplier to obtain
a fraudulent line count to insert on invoices," or inserted "hard

returns or bogus characters into reports to obtain a fraudulently inflated line count to insert on invoices."[8]  (Id. at ¶ 27.) MedQuist was able to invoice Plaintiffs at an "artificially inflat[ed]" rate, (id. at ¶ 21), according to the Complaint, by omitting from its bimonthly invoices "any breakdown for the costs charged," (id. at ¶ 22), "refus[ing] to release information to Kaiser about the manner in which its invoices were calculated," (id.), and "promising to produce backup counting data to resolve billing disputes, while knowing full well that there would never be such backup data because it did not exist."  (Id. at ¶ 36.)

In short, as in South Broward, "[t]he [Complaint] provides details about how MedQuist generated inflated invoices, how the invoices were upcharged and how Plaintiffs were invoiced by MedQuist."  South Broward, 516 F. Supp. 2d at 385.  Such details suffice "to put [Defendants] on notice of the conduct underlying Plaintiffs' claims, and are sufficiently specific to address Rule 9(b)'s concern over the in terrorem risk of nonspecific fraud claims."[9]  HT of Highlands Ranch, 590 F. Supp. 2d at 687; see

---

[8]  In light of Plaintiffs' specific allegations that MedQuist represented that it would compute charges on a per-character basis, when in fact it allegedly inflated billings by counting bogus characters, MedQuist's suggestion that Plaintiffs have failed to allege how such representations were "false or material," (Defs.' Br. at 7), is simply inaccurate.

[9]  The Plaintiffs in this case have alleged fewer discrete methods by which "the invoices were upcharged" than did the South Broward plaintiffs.  South Broward, 516 F. Supp. 2d at 385. However, the methods that are alleged herein are alleged with a

also In re Burlington Coat Factory, 114 F.3d at 1422 ("This is an adequate allegation of 'how' [the defendant] overstated its [billings], so we cannot say that plaintiffs have failed to state their claim with adequate particularity").

In addition, as was the case in South Broward, Plaintiffs' allegations target not a discrete instance of fraudulent conduct, but a protracted and systematic practice of overbilling that allegedly took place over a period of "more than seven years." (Compl. ¶ 24.)  As courts in this Circuit have long held, "when the transactions are numerous and take place over an extended period of time, less specificity in pleading fraud is required." Kronfeld, 638 F. Supp. at 1465; South Broward, 516 F. Supp. 2d at 385; HT of Highlands Ranch, 590 F. Supp. 2d at 687 n.10; Pep Boys, Manny, Moe & Jack v. American Waste Oil Services Corp., No. 96-7098, 1997 WL 367048, at *4 (E.D. Pa. June 25, 1997); In re Sunrise Securities Litigation, 793 F. Supp. 1306, 1312 (E.D. Pa. 1992); Alfaro v. E.F. Hutton & Co., Inc., 606 F. Supp. 1100, 1108 (E.D. Pa. 1985).  Moreover, consistent with the recognition by

---

comparable level of specificity to the allegations found to be satisfactory in that case.  Rule 9(b)'s specificity requirement is, generally speaking, one of depth, not breadth, of treatment in a plaintiff's pleadings.  Given that the more discrete fraudulent activities alleged in this case would, if supported by evidence, suffice to prove Plaintiffs' common law fraud claims, the fact that Plaintiffs have fewer factual avenues with which to prove MedQuist's alleged fraud than did the South Broward plaintiffs does not undermine the sufficiency of Plaintiffs' pleadings for Rule 9(b) purposes.

the Court of Appeals that "in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs," <u>Craftmatic</u>, 890 F.2d at 645, Plaintiffs' allegation that "[t]he specific internal corporate mechanisms and operations by which MedQuist carried out the fraud . . . and the specific activities engaged in by specific personnel in furtherance of the fraud, are within the exclusive knowledge and understanding of those within MedQuist," (Compl. ¶ 25), warrants "relax[ation of] the rule . . . [because such] factual information is peculiarly within the defendant's knowledge or control." <u>Craftmatic</u>, 890 F.2d at 645.

In short, as in <u>South Broward</u>, "Plaintiffs' fraud allegations provide enough specifics to put MedQuist on notice of the nature and circumstances of the claims against them," <u>South Broward</u>, 516 F. Supp. 2d at 384, and MedQuist's motion to dismiss on Rule 9(b) grounds will accordingly be denied.

**E.   Statute of Limitations**

Defendants challenge the timeliness of Plaintiffs' fraud claims, arguing that California's three-year statute of limitations for fraud claims applies to Plaintiffs' Complaint and that Plaintiffs' claims were not filed within this three-year period.  Plaintiffs challenge the applicability of California's statute of limitations, arguing instead that New Jersey's six-year statute applies, and argue that dismissal is inappropriate

18

even under the three-year limitations period.  The following
discussion addresses the choice-of-law issue raised by the
parties' arguments before explaining why Defendants' argument
concerning the timeliness of Plaintiffs' claims is unavailing at
the motion-to-dismiss stage.

    1.   Choice of Law

    As the Court explained, <u>supra</u>, in determining which statute
of limitations to apply to Plaintiffs' fraud claims in this
diversity action originally filed in California state court, the
Court must apply California's choice-of-law rules.  Van Dusen,
376 U.S. at 639.  Under California law, the Court applies a
governmental interest approach to the choice-of-law question for
tort claims, assessing whether each state has an interest that
would be "significantly furthered" by the application of its law
to the case, and, if such competing interests exist, determining
"whose interest would be the more impaired if its law were not
applied."  Corondoni, 169 Cal. App. 3d at 372 (citations
omitted).

    The Court holds that the three-year statute of limitations
applies to Plaintiffs' claims.  As California courts have
recognized, the governmental purpose served by statutes of
limitation "is to protect the enacting state's residents and
courts from the assertion of stale claims."  Corondoni, 169 Cal.
App. 3d at 373; see also Ashland Chemical Co. v. Provence, 129

Cal. App. 3d 790, 794 (Cal. Ct. App. 1982).  As the Court of

Appeals for the Ninth Circuit has explained:

> Where the conflict concerns a statute of limitations, the
> governmental interest approach generally leads California
> courts to apply California law.  Witkin, 3 California
> Procedure § 104 (4th ed. 1996); see, e.g., Peterson v.
> Kennedy, 771 F.2d 1244, 1251 n.4 (9th Cir. 1985);
> American Bank of Commerce v. Corondoni, 169 Cal. App.3d
> 368 (1985)[.]  [This is] . . . especially so where
> California's statute would bar a claim.  California's
> interest in applying its own law is strongest when its
> statute of limitations is shorter than that of the
> foreign state, because a "state has a substantial
> interest in preventing the prosecution in its courts of
> claims which it deems to be 'stale.'  Hence, subject to
> rare exceptions, the forum will dismiss a claim that is
> barred by its statute of limitations."  Restatement
> (Second) of Conflict of Laws § 142, cmt. f (1988).

Deutsch v. Turner Corp., 324 F.3d 692, 716-17 (9th Cir. 2003)

(emphasis added).  Moreover, New Jersey has no interest in

enforcing its lengthier statute of limitations in this matter –

because the only New Jersey residents in this case are the

Defendants, it would not "protect the enacting state's [i.e., New

Jersey's] residents and courts from the assertion of stale

claims," to enforce its statute of limitations in this case.[10]

---

[10]   Although not addressed by the parties, the choice-of-law
question in this case is rendered technically, although not
practically, more complicated by the fact that two Plaintiffs –
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. (a
Maryland corporation), and Kaiser Foundation Health Plan of
Colorado (a Colorado corporation) – have no apparent connection
to California.  However, because the statute of limitations on
fraud claims in Maryland and Colorado mirrors California's three-
year statutory period, see Colo. Rev. Stat. Ann. § 13-80-101; AAA
Antiques Mall, Inc. v. VISA, U.S.A., Inc., 558 F. Supp. 2d 607,
611 (D. Md. 2008), there is no practical difference between
applying the California or the Maryland/Colorado statutes.

<u>Corondoni</u>, 169 Cal. App. 3d at 373.  The Court accordingly concludes that the statute of limitations applicable to Plaintiffs' fraud claims is three years.

        2.   <u>Timeliness of Claims at Motion-to-Dismiss Stage</u>

Although Defendants are thus correct that a three-year statute of limitations applies to Plaintiffs' fraud claims, the Court will deny Defendants' motion to dismiss because the facts upon which Defendants rely in asserting that Plaintiffs' claims are untimely are not evident from the face of the Complaint.  In support of its argument concerning the untimeliness of Plaintiffs' claims, MedQuist notes that on July 30, 2004, it issued a press release concerning the billing practices Plaintiffs cite in their Complaint.  Although Plaintiffs do not expressly cite the press release in the Complaint, MedQuist argues that the Complaint makes reference to facts that "MedQuist has admitted," (Compl. ¶¶ 18-19), and uses language that closely tracks the contents of the 2004 press release.  MedQuist

----

In any event, because California's three-year statute of limitations is procedural, not substantive, <u>see</u> <u>Regents v. Hartford Accident & Indemnity Co.</u>, 21 Cal. 3d 624 (1978), it is controlled by the law of the forum (California in this case, <u>see</u> <u>Van Dusen</u>, 376 U.S. at 639), irrespective of which state's substantive law governs the cause of action.  <u>See</u> Restatement (Second) of Conflict of Laws § 142(1) ("An action will not be maintained if it is barred by the statute of limitations of the forum . . ."); <u>see</u> <u>also</u> <u>Deutsch</u>, 324 F.3d at 716-17; <u>cf.</u> <u>Sun Oil Co. v. Wortman</u>, 486 U.S. 717, 728-29 (1988) (explaining that it offends neither due process nor the Full Faith and Credit Clause for a state to apply its own statute of limitations to a cause governed by another state's substantive law).

concludes from these facts that Plaintiffs were aware of the
factual basis of their claim no later than July 30, 2004, well
over three years before this lawsuit was filed.

This argument is unpersuasive for two reasons.  First,
MedQuist's July 30, 2004 press release is not cited in the
Complaint, is not presently before the Court, and cannot be
relied upon at the motion-to-dismiss stage.  "In deciding motions
to dismiss pursuant to Rule 12(b)(6), courts generally consider
only the allegations in the complaint, exhibits attached to the
complaint, matters of public record, and documents that form the
basis of a claim."  <u>Lum</u>, 361 F.3d at 222 n.3 (citation omitted).
As to this final category of documents that form the basis of a
claim, "what is critical is whether the claims in the complaint
are <u>based on</u> an extrinsic document [or] . . . whether the
extrinsic document was <u>explicitly cited</u>."  <u>Burlington Coat
Factory</u>, 114 F.3d at 1426 (internal quotations and citations
omitted, emphasis added).  Neither of these circumstances applies
here – while Plaintiffs' fraud claims may ultimately be impacted
by whether Plaintiffs knew of MedQuist's billing practices in
2004, their claims certainly are not "based on" MedQuist's press
release, and the press release is nowhere "explicitly cited" in
the Complaint.  <u>Id.</u>

Secondly, and perhaps more to the point, even if the Court
could look to the press release, the mere fact that MedQuist made

22

a statement concerning its billing policies in 2004 would not, as a matter of law at the motion-to-dismiss stage, render Plaintiffs' claims untimely.  As the Court of Appeals for the Ninth Circuit has explained, under California law, "[a] cause of action accrues when the claim is complete with all of its elements."  Platt Elec. Supply, Inc. v. EOFF Elec., Inc., 522 F.3d 1049, 1054 (9th Cir. 2008) (citation omitted).  "Although this ordinarily occurs on the date of the plaintiff's injury, accrual is postponed until the plaintiff either discovers or has reason to discover the existence of a claim, i.e., at least has reason to suspect a factual basis for its elements."  Id. (citation omitted) (noting as well that the question is whether a plaintiff has "a reasonable ground for suspicion").  At the motion-to-dismiss stage, at which the Court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief," Phillips, 515 F.3d at 231, the Court certainly cannot conclude as a matter of law that Plaintiffs had a reasonable ground for suspicion in 2004 from the mere fact that MedQuist issued a press release at that time.  To do so would, at minimum, require the Court to draw factual inferences about the press release (about how well-publicized it was and in what geographic regions, for example) which the Court is in no position to do at this stage of the litigation.

23

In summary, Defendants' arguments concerning the untimeliness of Plaintiffs' fraud claims are not suitable to disposition upon the motion to dismiss presently under consideration.[11]  This aspect of Defendants' motion to dismiss will accordingly be denied.

**F.   Unfair Competition Law Claim**

For the following reasons, the Court will grant MedQuist's motion to dismiss Plaintiffs' UCL claim, to the extent that Plaintiffs assert such a claim pursuant to the UCL's fraudulent business practices prong, but will permit Plaintiffs' UCL claim to proceed pursuant to the UCL's unlawful business practices prong.[12]

---

[11]  Because grounds for dismissal under statute of limitations grounds are not evident on the face of the Complaint, see supra, the Court need not reach MedQuist's argument that under California law, the statute of limitations for a putative class member is not tolled while a nationwide class action is pending.  See Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1025 (9th Cir. 2008) (explaining that "[t]he rule of American Pipe – which allows tolling within the federal court system in federal question class actions – does not mandate cross-jurisdictional tolling as a matter of state procedure," and that "California's interest in managing its own judicial system counsel us not to import the doctrine of cross-jurisdictional tolling into California law").  Assuming that MedQuist is correct, dismissal on statute of limitations grounds, irrespective of tolling, is not warranted for the reasons explained above.

[12]  It bears recognition that there appears to be no reason why Kaiser Foundation Health Plan of the Mid-Atlantic States and Kaiser Foundation Health Plan of Colorado, neither of which has any apparent connection to California, should be permitted to avail themselves of the protections of California's UCL.  However, MedQuist does not raise this point in arguing its motion

> Section 17200 of the UCL prohibits "any unlawful, unfair
> or fraudulent business act or practice."  Cal. Bus. &
> Prof. Code § 17200.  Thus, the UCL proscribes "three
> varieties of unfair competition – acts or practices which
> are unlawful, or unfair, or fraudulent."  Cel-Tech
> Commc'n Inc. v. Los Angeles Cellular Tele. Co., 20 Cal.
> 4th 163 (1999).  California law requires a plaintiff to
> state "with reasonable particularity the facts supporting
> the statutory elements of the violation" of Section
> 17200.  Khoury v. Malys of Cal., Inc., 17 Cal. Rptr. 2d
> 708, 712 (1993).

South Broward, 516 F. Supp. 2d at 400; see also Sybersound

Records, Inc. v. UAV Corp., 517 F.3d 1137, 1051 (9th Cir. 2008)

("California's statutory unfair competition laws broadly prohibit

unlawful, unfair, and fraudulent business acts"); National Rural

Telecommunications Co-op. v. DIRECTV, Inc., 319 F. Supp. 2d 1059,

1073 (C.D. Cal. 2003).  As Plaintiffs make clear in their brief

in opposition to Defendants' motion to dismiss, their UCL claim

is brought under the UCL's unlawful and fraudulent prongs.

     While Plaintiffs' claim cannot be pursued via the fraudulent

business acts or practices prong, they have stated a claim under

the UCL's unlawful practices prong.  As to the UCL's prohibition

of fraudulent business acts, it is well-settled that "fraudulent

acts are ones where members of the public are likely to be

deceived."  Sybersound Records, 517 F.3d at 1152 (emphasis

added).  As one court has explained:

> [Defendant] argues that "[b]ecause Plaintiffs are not
> members of the general public, Plaintiffs are not

_____

to dismiss, and the argument above focuses exclusively on the
arguments raised by the parties.

> entitled to [section] 17200 protections for fraudulent
> actions."  The Court agrees.  See <u>South Bay Chevrolet v.
> GMAC</u>, 72 Cal. App. 4th 861, 888 (1999) ("'Fraudulent,' as
> used in the statute, does not refer to the common law
> tort of fraud but only requires a showing members of the
> public are likely to be deceived.") (internal quotations
> omitted); <u>see also</u> <u>Watson Labs.</u>, 178 F. Supp. 2d at 1121
> ("it is "necessary under the 'fraudulent' prong [of the
> UCL] to show deception to some members of the public, or
> harm to the public interest, and not merely to the direct
> competitor or other non-consumer party to a contract.")
> . . . . Sophisticated companies, like Plaintiffs here,
> are not members of the "general public."

<u>DIRECTV, Inc.</u>, 319 F. Supp. 2d at 1077-78 (some internal
quotations and citations omitted).  Plaintiffs have only alleged
that they, not members of the general public, have been
defrauded, and such allegations do not state a claim under the
UCL's fraud prong.  <u>See</u> <u>id.</u>; <u>Sybersound Records</u>, 517 F.3d at
1152.  Therefore, to the extent that Plaintiffs allege a UCL
cause of action based upon the "fraudulent" prong of Section
17200, the Complaint fails to state a claim for which relief may
be granted and it will be dismissed.

However, Plaintiffs have stated a claim under the UCL's
"unlawful . . . practice" prong.  § 17200.  As has been widely
recognized, "[t]he California Supreme Court has given the term
'unlawful' a straightforward and broad interpretation."  <u>CRST Van
Expedited, Inc. v. Werner Enterprises, Inc.</u>, 479 F.3d 1099, 1107
(9th Cir. 2007).

> The UCL covers a wide range of conduct.  It embraces
> anything that can properly be called a business practice
> and that at the same time is forbidden by law . . . .
> Section 17200 "borrows" violations from other laws by

making them independently actionable as unfair competitive practices.

Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1143 (2003) (citation omitted).  The commission of a tort through business practices constitutes unlawful conduct under the UCL, as the Court of Appeals for the Ninth Circuit has made clear:

> First, [Plaintiff's] allegation of intentional interference by a corporate competitor with the employment contracts [Plaintiff] had with two of its drivers clearly alleges a business act or practice. Second, intentional interference with contract is a tortious violation of duties imposed by law.  We need go no further to conclude that the district court must be reversed on its dismissal of Count III.  We conclude [Plaintiff] adequately alleged a violation by [Defendant] of the UCL by alleging [Defendant] engaged in an "unlawful" business practice, to wit, intentional interference with existing contracts of employment.

CRST Van Expedited, 479 F.3d at 1107 (some internal quotations and citations omitted).

Plaintiffs have alleged that Defendants engaged in an "unlawful . . . business act or practice," § 17200, with "reasonable particularity."  Khoury, 17 Cal. Rptr. 2d at 712. Plaintiffs allege that MedQuist "negotiat[ed] and induc[ed] Kaiser to enter into contracts for counting lines of medical transcription and invoicing Kaiser on an agreed upon price per AAMT line while knowing full well that the AAMT counting was not going to occur," (Compl. ¶ 36), and that MedQuist "add[ed] bogus numbers of lines on [its] invoices to Kaiser in order to obtain more money per invoice than that to which MedQuist was

27

contractually entitled."   (Id.)   Plaintiffs have further alleged
that MedQuist committed such acts "in order to increase the
amount actually billed to [Plaintiffs] in order to increase
profit margins."[13]   (Id. at ¶ 19.)   Such allegedly tortious
conduct, if proven, would constitute "a tortious violation of
duties imposed by law," which suffices to state a claim under the
UCL for unlawful act or business practice, as CRST Van Expedited
makes clear.[14]   479 F.3d at 1107.   The Court will thus deny
Defendants' motion to dismiss Plaintiffs' UCL claim for unlawful
act or business practice, while granting the motion to dismiss
Plaintiffs' UCL claim under the "fraudulent" prong of the UCL.

--------

[13]   In this respect, the Complaint at issue herein is more
detailed than that under consideration in South Broward.   In
South Broward, the Court observed that "Plaintiffs' UCL claim is
bare bones," in that "Plaintiffs do not allege which business
practices were forbidden by law, which were unfair or which were
fraudulent.   Without this level of particularity, Plaintiffs
claim under the UCL must be dismissed."   South Broward, 516 F.
Supp. 2d at 401.   The Kaiser Plaintiffs, by contrast, have
identified within their UCL pleading the allegedly fraudulent
conduct underlying their claim.

[14]   MedQuist is correct that Plaintiffs' breach-of-contract
claim alone cannot serve as the requisite underlying unlawful act
for purposes of their UCL claim.   See Nat'l Rural Telecomm.
Co-op., 319 F. Supp. 2d at 1074 ("a breach of contract may form
the predicate for a section 17200 claim, provided it also
constitutes conduct that is unlawful, or unfair, or fraudulent")
(citation omitted).   However, Plaintiffs' claim based upon
Defendants' allegedly tortious conduct does form the predicate
act for a section 17200 claim, because a "tortious violation of
duties imposed by law" constitutes an unlawful practice under the
UCL.   CRST Van Expedited, 479 F.3d at 1107.

G.   **Remaining Considerations**

The Court need not dwell long on MedQuist's final arguments. First, MedQuist argues that Plaintiffs have failed to state a claim for breach of contract because the Complaint fails to allege performance on the part of Plaintiffs.  This characterization of the Complaint is simply inaccurate – the Complaint twice alleges that Plaintiffs paid the amounts invoiced by MedQuist, (Compl. ¶¶ 23, 31), which undoubtedly constitutes performance under the contracts.

Finally, MedQuist argues that Plaintiffs' equitable claims for unjust enrichment and for an accounting must be dismissed because such equitable remedies are available only when a remedy at law is unavailable.  This exact point was considered, and rejected, by the Court in South Broward:

> At this stage in the litigation, the Court will allow Plaintiffs' equitable claims for an accounting and unjust enrichment to go forward against the MedQuist Defendants. Plaintiffs are simply taking advantage of the fact that Rule 8(e)(2), Fed. R. Civ. P.[,] allows a plaintiff to plead in the alternative.  Id.  Decisions from this District and others have reiterated this point.  See In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (plaintiffs "are clearly permitted to plead alternative theories of recovery," including unjust enrichment and parallel remedies at law); see also United States v. Kensington Hosp., 760 F. Supp. 1120, 1135 (E.D. Pa. 1991) (finding dismissal of unjust enrichment claim premature where federal rules allow pleading alternative theories of recovery).

South Broward, 516 F. Supp. 2d at 386.  This reasoning applies with equal force to the identical equitable claims in this case.

29

Defendants' motion to dismiss Plaintiffs' claims for unjust enrichment and for an accounting will accordingly be denied.

**IV.  CONCLUSION**

  For the reasons explained above, the Court will deny Defendants' motion to dismiss in all respects except that Plaintiffs' claim under the "fraudulent" prong of the UCL will be dismissed.  The accompanying Order is entered.


**April 8, 2009**             **s/ Jerome B. Simandle**
Date                   JEROME B. SIMANDLE
                   United States District Judge